Judgment rendered December 23, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,618-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

Versus

JARVIS DEWAYNE TAYLOR                       Appellant

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2022-CR-3320

Honorable Clarence Wendell Manning, Judge

* * * * *

LOUISIANA APPEALS AND                       Counsel for Appellant
WRIT SERVICE
By: Holli Herrle-Castillo

ROBERT STEPHEN TEW                          Counsel for Appellee
District Attorney

HOLLY CHAMBERS-JONES
JOHN WALLACE FREEMAN
CHARLES WILLIAM HEROLD, III
Assistant District Attorneys

* * * * *

Before STONE, STEPHENS, and ROBINSON, JJ.

**STEPHENS, J.,**

This criminal appeal arises out of the Fourth Judicial District Court, Parish of Ouachita, State of Louisiana, the Honorable C. Wendell Manning, Judge, presiding. The defendant, Jarvis DeWayne Taylor, was convicted by a unanimous jury of the second degree murder of his ex-girlfriend, Ebony Lewis, a violation of La. R.S. 14:30.1, and sentenced by the trial court to the mandatory term of life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. Taylor has appealed his conviction, urging insufficiency of the evidence. Finding no error, we affirm Taylor's conviction and sentence.

## FACTS AND PROCEDURAL BACKGROUND

The 23-year-old victim Ebony Lewis was killed by her ex-boyfriend Jarvis Taylor on July 8, 2022. On that date, deputies from Ouachita Parish Sheriff's Office ("OPSO") responded to a welfare concern call from Taylor's mother to 911 after her son who lives in Michigan had alerted her to a disturbing phone call he had received from Taylor. OPSO deputies were dispatched to Ms. Lewis's apartment on Wooddale Drive in Monroe, Louisiana, where they discovered the body of Ms. Lewis. Local authorities were also responding to reports of a person threatening to jump from the Lea Joyner Bridge. This turned out to be Taylor, distraught over having killed Ms. Lewis. He was arrested once he came down from the bridge and on August 29, 2022, he was charged by indictment with second degree murder for Ms. Lewis's death.

At trial it was stipulated by the defense and prosecution that Taylor killed Ms. Lewis. The first witness to testify was the defendant's mother, Shadayna Taylor. Ms. Taylor testified that Taylor had been living with her

about a month on July 7, 2022.  He had moved in after he and Ebony had broken up.  She testified that Taylor was behaving normally prior to the incident.  The prosecutor showed Ms. Taylor two photographs.  She identified the white-handled knife depicted in State's Exh. No. 1 as one that had come from her kitchen; she identified State's Exh. No. 2 as a close-up photo of that same knife's handle.

Montel McDonald testified that he and Ms. Lewis had been friends over the years and had reconnected again in June of 2022.  At that time, he was living in Greenwood, Mississippi.  For the dates July 1 through 4, 2022, he was in Monroe to celebrate his birthday.  When he was in town, he and Ms. Lewis spent time together, and they talked on the phone.  When he went back to Mississippi, he and Ms. Lewis talked every day; they were excited to speak to each other because it was a new relationship.  McDonald testified that on the evening of July 7, 2022, during a Facetime phone call with each other, both he and Ms. Lewis fell asleep.  He woke up in the early morning hours and heard a faint cry of what he believed was Ms. Lewis's voice saying, "help me, help me."  He picked up the phone and noticed that it had been hung up on Ms. Lewis's end.  McDonald stated that repeated attempts to call Ms. Lewis were unsuccessful, and when he called the police, they wouldn't tell him anything.  He later learned that Ms. Lewis had been killed.

Captain C.J. "Charlie" Beck from the West Monroe Police Department ("WMPD") testified that on July 8, 2022, he was dispatched to the Lea Joyner Bridge in Monroe in response to a situation involving a possible jumper who was talking about suicide.  Capt. Beck identified Taylor as the person who was sitting on top of the bridge when he arrived on the scene.  Once Capt. Beck had established a rapport with Taylor, the defendant

2

told Capt. Beck that he had killed his girlfriend and felt like he should die. Capt. Beck told the jury that the purpose that day was to get him safely off the bridge, not interrogate him, so he avoided questioning him.  Instead, he negotiated with Taylor, giving him water in exchange for Taylor getting down from the railing.  However, Taylor talked to him because he wanted to talk about what he had done.

Taylor told Capt. Beck that:

- He and his girlfriend had a recent breakup that he was heartbroken over;

- He had gone to his ex-girlfriend's house in the early morning hours and watched her through the window before sneaking in the window;

- He then straddled her and put his hand over her mouth;

- He told her he wanted to talk to her and her to listen;

- His girlfriend wouldn't listen to him;

- He snapped and stabbed her several times in the head;

- He "came out of it" and realized what he had done;

- At that point he tried to drag her to the door to take her to the hospital;

- Because he couldn't get her out, he left her where she was; and,

- He took the knife, wrapped it up in the shirt, and left it in the car that he had driven to the bridge.

After about four hours, when Taylor went to grab his third water bottle, officers moved in and secured him to keep him from going back out on the bridge railing.  Because Taylor asked him to, Capt. Beck rode with Taylor in the ambulance to the hospital, and Taylor received treatment in the St. Francis Medical Center's emergency room.

Capt. Beck testified that he also went into the room in the courthouse annex where Inv. Ainsworth was trying to obtain a statement.  Capt. Beck

3

told Taylor that he had an opportunity to give his statement to the investigators, to tell them what had happened as he had told him on the bridge. According to Capt. Beck, Taylor was not as open in the interview room as he was on the bridge, and he told Capt. Beck that he had told *him* everything that had happened while they were on the bridge.

OPSO Investigator Colby Ainsworth testified that he was the Violent Crimes Unit investigator assigned to work Ms. Lewis's homicide. He got a call between 6:00 and 7:00 a.m. on July 8, 2022, to go to 340 Wooddale Apt. #5. Upon his arrival, he was briefed by the shift supervisor on scene, and he made observations from both doorways of the apartment, as both the front and back doors were open. Inv. Ainsworth saw the deceased body of the victim lying in a pool of blood in the apartment's hallway. He learned that the initial responding deputies had gone in to determine whether Ms. Lewis was alive or deceased, but upon determining that she was no longer alive, they went back outside. The prosecutor then had Inv. Ainsworth identify in court the search warrant he applied for that morning prior to the search that was conducted of Ms. Lewis's apartment.[1] Inv. Ainsworth then talked the jury through a number of photos of the crime scene.[2] These included photos of the victim, and photos of a black-handled knife, cell phone, bottle of lubricant, and sex toy found in the victim's bedroom.

Inv. Ainsworth told the jury that after he reviewed the crime scene that morning, he headed to the Louisville Bridge[3] between Monroe and West

---

[1] The warrant was introduced into evidence as State's Exh. No. 3.

[2] The photos were introduced into evidence as State's Exh. Nos. 4-45.

[3] This bridge is also known as the Lea Joyner Bridge.

Monroe, which was where crisis negotiators OPSO Lt. Miranda Rogers and WMPD Capt. (then Lt.) C.J. Beck were talking to Taylor. Once Taylor came down, he was brought to a local hospital to be checked out. Inv. Ainsworth testified that he followed close behind; he wanted to be sure Taylor made it to the hospital. Inv. Ainsworth then went back to his office at the courthouse annex to start gathering details about the case. When Taylor was brought to the annex interview room, Inv. Ainsworth went to speak with him for the first time. Inv. Ainsworth told the jury that at that point, Taylor had not been formally arrested but he was not free to leave. He was going to undergo custodial interrogation, so Inv. Ainsworth introduced himself and went over the *Miranda* rights waiver form with Taylor.[4]

Taylor's statement, including the *Miranda* advisement and form execution, was audio and videotaped. For the second half of the interview, Inv. Rogers was present. The recorded interview was played for the jury.[5] Inv. Ainsworth also identified a user's application screenshot of a Facebook post[6] made by Taylor on his Facebook account shortly after Ms. Lewis's murder; Taylor's post stated, "I'm sorry ya'll. I just killed the woman that I love and now it's my time. I couldn't handle the pain any longer." The witness then showed the jury the white-handled knife found in Taylor's Lincoln Navigator and the black-handled one found in the victim's bedroom and explained that both knives were used during the crime.[7]

---

[4] What this involved was Inv. Ainsworth reading Taylor his *Miranda* rights and having him sign a form acknowledging his understanding of those rights prior to giving a statement. Taylor's form was introduced into evidence as State's Exh. No. 46.

[5] This recording was introduced into evidence as State's Exh. No. 47.

[6] The screenshot obtained after metadata from the account was produced in response to a warrant obtained by Inv. Ainsworth was introduced into evidence as State's Exh. No. 48.

On cross-examination, Inv. Ainsworth testified that during his investigation he found a cell phone, sex toy, and lotion on Ms. Lewis's bed.[8] He also acknowledged that one thing Taylor refused to answer during his interview was the "why" or motive behind this crime. On re-direct, Taylor noted that during the interview, Taylor refused to answer:

- Whether or not he used a knife;

- Inv. Rogers' question as to whether he brought the knives to Ms. Lewis's house; and,

- Whether he actually killed Ebony.

Instead, anything that could have been against his interest, Taylor remained silent or sat there for a moment before redirecting the conversation somehow. Inv. Ainsworth emphasized that the pictures of Ms. Lewis's bedroom showed that there was blood from one side of the room all the way around to the other. Further, there was no way of knowing what was on the bed at the time Taylor broke in through Ms. Lewis's window. Inv. Ainsworth stated that just because the items were on her bed when officers got to her home doesn't mean they were there at the time Taylor killed Ms. Lewis. Likewise, Taylor never mentioned Ms. Lewis being on Facetime when he broke in or having sex talk with someone on the phone during their interview.

Prior to the testimony of the next witness, a La. C.E. art. 412.4 admissibility hearing was held outside of the jury's presence. Once the trial court found the witness's testimony admissible, the jury returned to the courtroom. Northwestern State University Police Department ("University

---

[7] The knives were introduced into evidence as State's Exh. Nos. 49 and 50.

[8] These items were introduced into evidence as Defense Exh. Nos. 1, 2 and 3.

6

Police") Sergeant Christopher Knight testified that on January 26, 2020, Ms. Lewis reported to University Police that she had been romantically involved with Taylor "off and on" but had recently ended their relationship. She had agreed to drive him from Monroe to Natchitoches so he could try to secure transportation to New Mexico. When they got to her apartment in Natchitoches, Taylor asked Ms. Lewis if he could get some of his things from her apartment. Ms. Lewis agreed, but her condition was that Taylor was not to enter her apartment. As she opened the door, Taylor shoved her and tried to force his way into the apartment. Taylor got angry and struck Ms. Lewis several times. She had to call a friend to make Taylor leave her apartment.

Taylor responded by posting a video of him and Ms. Lewis engaged in sexual intercourse on Snapchat. Ms. Lewis showed the video to Sgt. Knight and told him she had not given Taylor permission to post the video. Ms. Lewis contacted him a second time and reported that she had seen Taylor standing outside her apartment. However, she was able to leave before he could see her.

When Sgt. Knight spoke to Taylor, he told Sgt. Knight that he was at Ms. Lewis's apartment to pick up his things. Sgt. Knight *Mirandized* Taylor at that time. Taylor admitted that he posted the explicit video of Ms. Lewis, but his account was private. However, when asked about the incident at Ms. Lewis's apartment, Taylor stated he was welcome at Ms. Lewis's, she said he was not, and a shoving match had occurred. Taylor said he did not hit Ms. Lewis. Sgt. Knight learned later that Ms. Lewis found out about the Snapchat post because a third party told her it had been posted, which meant

it was not private.[9]  Taylor was arrested and charged with Home Invasion, Domestic Battery of a Dating Partner, and Video Voyeurism.

Dr. Frank Peretti, a forensic pathologist, performed an autopsy on Ms. Lewis's body.  Her cause of death was multiple sharp force injuries.[10] According to Dr. Peretti, the fatal injury was the stab wound behind her ear which involved her carotid artery, right jugular vein, and esophagus and caused internal and external bleeding.

Taylor was the only defense witness to testify.  He told the jury that he pled guilty to battery of a dating partner and nonconsensual disclosure of a private image in connection with the incident in Natchitoches and served five months in jail.  Those were the only two things he was convicted of.[11] He lived with his mom for a couple of weeks then Ebony asked him to move back in with him, and he was with her until June of 2022.  According to Taylor, they broke up because he wasn't giving her any attention.

Taylor testified that he went over to Ms. Lewis's house that day in July 2022 to get closure because he was seeing another young lady.  He knocked on the door but Ms. Lewis didn't answer.  He went around to the back and saw the light was on.  He thought she was up and he tried the window, which was open.  He went through the window because he had lost his key.  When he went in, he saw the dildo, Vaseline, and phone.  He didn't expect to see that and "I snapped."  He saw the dildo and "she was on

---

[9] The University Police report, which includes a written statement provided by Ms. Lewis, was introduced into evidence as State's Exh. No. 51.

[10] Photos of the autopsy were introduced into evidence as State's Exh. Nos. 54-64.

[11] While in jail on the initial three charges, Taylor was charged with obstruction of justice for having another inmate call Ms. Lewis to ask her to drop the charges against Taylor.

Facetime with another person....They was having phone sex." When he snapped, he stabbed her. He doesn't know how many times. When he stopped stabbing, "blood was shooting out her neck. And I was trying to get a sheet and put it over her neck and stop the bleeding. Shit was everywhere. Shit was running around everywhere."

Taylor told the jury he tried to get Ms. Lewis to the hospital but "[s]he fell out of the doorway face first." Then he called his brother and told him to call his mom. "And I left....I ain't know what else to do." Then he went to the bridge. Taylor stated that he also posted something on social media because he was truly sorry. He didn't jump off the bridge because his brother and mom were telling him "don't do it." Then the police came and he was there talking to them. He talked to Deputy Rogers about life and admitted to the killing. He refused to tell the detectives why he killed Ms. Lewis because "I honestly felt like it didn't matter because at the time it didn't." What he meant was what he said—she was gone. He felt like shit. Taylor said that he feels sorry, very remorseful, and he regrets what he did. He testified that he did not go over there with the intent to kill Ms. Lewis. When his attorney asked him to describe to the jury how he felt when he walked into her room (actually he climbed in through her window), Taylor said, "Just so much anger. I ain't never been that mad before."

On cross-examination, Taylor acknowledged that he brought the white-handled knife his mother identified during her testimony with him over to Ms. Lewis's home that night. He also stated that he could see through the window even though there was a covering on it. In response to questions posed by the prosecutor, Taylor's story changed. He told the jury that he and Ms. Lewis talked for several minutes while they lay in her bed.

9

When she told him she had multiple sexual partners in a bed that he had purchased, he "snapped." That sent him into a rage. The whole time they were talking, he had the butcher knife hidden in his shorts "for protection" in case some man was in the house. To explain the second knife (the black-handled one found in Ms. Lewis's bed), Taylor claimed that he went to the kitchen and got it "first" when he got there.

When the prosecutor reminded Taylor about McDonald's testimony about hearing the faint cry for help from Ms. Lewis over Facetime then noticing that he was disconnected, Taylor testified that he was the one who hung up the Facetime call with McDonald. His reasoning was McDonald didn't live there, and "he" was asleep. Taylor related that while he didn't call 911 himself, he called his brother and had him call and ask their mom to call.

Both sides made their closing arguments, the trial judge instructed the jury, and the 12-person jury returned a unanimous verdict of guilty of second degree murder after deliberations. On April 14, 2025, Taylor was sentenced by the trial court to the mandatory term of life imprisonment without the benefit of probation, parole, or suspension of sentence. Taylor has appealed, urging insufficiency of the evidence to support the jury's verdict of second degree murder.

## DISCUSSION

### *Arguments of the Parties*

Taylor urges that the jury, viewing the evidence in the light most favorable to the State, could not have found that the mitigatory factors of sudden passion or heat of blood (which would make Ms. Lewis's killing manslaughter, not second degree murder) were not established in this case.

10

He cites his own testimony and photos of the crime scene in support thereof. On the other hand, the State contends that the evidence introduced at trial "overwhelmingly" supports the jury's verdict of second degree murder.

### Applicable Legal Principles

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *Id*. The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Morehead*, 55,825 (La. App. 2 Cir. 10/23/24), 400 So. 3d 302, *writ denied*, 24-01434 (La. 2/19/25), 400 So. 3d 932. A reviewing court accords great deference to the trier of fact's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jackson*, 53,497 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1156.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S.

11

14:30.1(A)(1). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Walker*, 53,975 (La. App. 2 Cir. 6/30/21), 321 So. 3d 1154, *writ denied*, 21-01334 (La. 11/23/21), 328 So. 3d 83. Specific intent to kill can be inferred by the intentional use of a deadly weapon. *State v. Fields*, 42,761 (La. App. 2 Cir. 1/9/08), 973 So. 2d 973, *writ denied*, 08-0469 (La. 9/26/08), 992 So. 2d 983. The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of this determination is guided by the standards of *Jackson v. Virginia*, *supra*.

Under La. R.S. 14:31(A)(1), manslaughter is a homicide which would be either first or second degree murder but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his cool reflection and self-control. The elements of "sudden passion" and "heat of blood" are mitigating factors in the nature of a defense and, when such factors are established by a preponderance of the evidence, a verdict for murder is inappropriate. La. R.S. 14:31(A)(1); *State v. Reed*, 14-1980, p. 24 (La. 9/7/16) 200 So. 3d 291, 311, *cert. denied,* 580 U.S. 1166, 137 S. Ct. 787, 197 L. Ed. 2d 258 (2017); *State v. Lombard*, 486 So. 2d 106, 110-11 (La. 1986); *State v. Tompkins*, 403 So. 2d 644, 648 (La. 1981).

Accordingly, for murder to be reduced to manslaughter, the following must be proved by the defendant: (1) the homicide was committed "in sudden passion or heat of blood"; (2) that sudden passion or heat of blood

12

was immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection; (3) the defendant's blood did not cool between the provocation and the killing; and (4) an average person's blood would not have cooled between the provocation and the killing. *State v. Ary*, 56,273 (La. App. 2 Cir. 5/21/25), 411 So. 3d 972; *State v. Kennell*, 54,577 (La. App. 2 Cir. 6/29/22), 342 So. 3d 437; *State v. Efferson*, 52,306 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1153, *writ denied*, 18-2052 (La. 4/15/19), 267 So. 3d 1131.

A defendant who claims provocation, as a means of reducing murder to manslaughter, bears the burden of proving these elements by a preponderance of the evidence; additionally, provocation and the time for cooling are questions for the jury to determine according to the standard of the average or ordinary person. *State v. Leger*, 05-0011 (La. 7/10/06), 936 So. 2d 108, *cert. denied*, 549 U.S. 1221, 127 S. Ct. 1279, 167 L. Ed. 2d 100 (2007). The question for the appellate court on review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. *State v. Ary*, *supra*; *State v. Burse*, 19-381 (La. App. 5 Cir. 2/12/20), 289 So. 3d 690, *writ denied*, 20-00650 (La. 11/24/20), 305 So. 3d 104.

*Analysis*

The evidence in this case was sufficient to support the jury's verdict of second degree murder. The evidence established that Taylor went to Ms. Lewis's home armed with an eight-inch butcher knife. Once there, he watched her through a window, then broke in through that same window, went to the kitchen, and armed himself with a second knife. He then went to

her bedroom where he stabbed her multiple times in her face and neck. Taylor did not call 911 or render aid to Ms. Lewis; in fact, he admitted to the jury that it was he who hung up the Facetime call with McDonald, who had overheard Ms. Lewis faintly crying for help.

Regarding Taylor's "why" or motive, the State's theory (and the one reflected by the jury's verdict) was that Taylor had the specific intent to kill or inflict great bodily harm. The various "whys" set forth by the defense in support of manslaughter were:

- During the State's case-in-chief (and the first theory that Taylor tried on the jury), the defense theory was that Taylor was provoked because he observed Ms. Lewis having phone sex, as evidenced by the cell phone, lotion, and sex toy found in her bed.

- During her testimony, Inv. Rogers testified that while Taylor was on the bridge, he told her that he had gone to talk to Ms. Lewis that morning. When she would not talk to him, he snapped and stabbed her several times in the head.

- During cross-examination, Taylor told the jury that he snapped because Ms. Lewis told him she had been with multiple sex partners in the bed he had purchased.

Faced with three different "whys" or motives to support Taylor's claim that he lacked the specific intent required to commit murder, the jury obviously determined that none of the above three "whys" was believable and/or established by a preponderance of the evidence. In light of this record, we do not find reversible error.

## CONCLUSION

For the reasons set forth above, the conviction and sentence of the defendant, Jarvis Dewayne Taylor, are affirmed.

**AFFIRMED.**

14